## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of establishing
the defense of res judicata, collateral
estoppel, or the law of the case.



**FILED**

Feb 28 2017, 7:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy E. Stucky
Stucky, Lauer & Young, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Marjorie Newell
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of T.T.H. (Minor Child), | February 28, 2017 |
| | Court of Appeals Case No. 02A03-1606-JT-1457 |
| N.M.H., | |
| *Appellant-Respondent,* | Appeal from the Allen Superior Court |
| v. | The Honorable Charles F. Pratt, Judge |
| Indiana Department of Child Services, | The Honorable Lori K. Morgan, Magistrate |
| *Appellee-Petitioner.* | Trial Court Cause No. 02D08-1507-JT-91 |

**Najam, Judge.**

## Statement of the Case

N.M.H. ("Mother") appeals the trial court's termination of her parental rights over her minor child, T.T.H. ("Child"). Mother raises two issues for our review, which we restate as follows:

1. Whether the trial court's conclusion that Mother would not remedy the reasons for Child's continued removal from her care was clearly erroneous.

2. Whether the trial court's conclusion that termination of Mother's parental rights was in Child's best interest was clearly erroneous.

We affirm.

## Facts and Procedural History

Mother gave birth to Child on August 4, 2012.[1] On October 25, 2012, Mother brought Child to Parkview Hospital where child was admitted due to a cyanotic episode. Doctors prescribed an apnea monitor for Child. While Child was in the hospital, Mother repeatedly removed the apnea monitor from Child, despite hospital instructions to leave the monitor on. While staying with Child at the hospital, Mother slept with Child in Child's bed and with the blanket pulled

---

[1] Child's father has not been identified but is alleged to be D.M., who has not participated in this appeal.

over Mother's and Child's heads, despite hospital instructions that Mother not sleep with Child in this manner. During that hospital stay, Mother also yelled profanities into an empty hospital room. Due to Mother's behavior, a member of the hospital staff called the Indiana Department of Child Services ("DCS"), and the Child's doctor recommended that the Child not be released to Mother upon Child's discharge from the hospital.

[4] Mother has a history of involvement with DCS, including: a 2002 case involving another of Mother's children that was closed with a change of custody to a non-custodial parent; a 2007 case involving another of Mother's children that closed with an involuntary termination of parental rights; and a 2008 case involving another of Mother's children that closed with a guardianship over the child. In 2005, Mother was diagnosed with Post Traumatic Stress Disorder ("PTSD"), Psychotic Distress with dissociate symptoms, and Personality Disorder traits.

[5] On October 31, 2012, DCS filed a Child in Need of Services ("CHINS") petition alleging that Mother was unable or unwilling to appropriately provide care and support for Child and removed Child from Mother's care. The court ordered Mother to have supervised visitation with Child. On February 26, 2013, the trial court adjudicated Child to be a CHINS and entered dispositional and parental participation decrees ordering Mother to, among other things:

- Maintain contact with DCS;

- Provide caseworkers with signed and current consents of release and exchange of information;

- Attend and appropriately participate in all visits with Child in a supervised, therapeutic setting;

- Submit to a diagnostic assessment at Park Center and follow all recommendations;

- Take all medications as prescribed;

- Obtain a Family Functioning Assessment at Caring About People, Inc.; and

- Participate in medication review at Park Center and follow all recommendations.

Appellant's App. at 35-43.

[6]     On April 16, 2013, the court issued a review order finding that Mother had complied with services but that they had not been fully completed at that time. On August 25, 2014, the court issued a Permanency Plan Order approving a plan of granting custody of Child to her maternal great aunt, Mary Sneed. However, that potential family placement did not occur and, at a Detention Hearing on October 22, the court continued Child in licensed foster care and instructed DCS to investigate the possibility of placing Child with other family members. Mother continued to have supervised visitation with Child in a therapeutic setting.

[7] Some time in October 2014, Mother moved to Los Angeles, California and did not return to Fort Wayne until July 2015. While in California, Mother contacted Family Case Manager ("FCM") Stacey Kammer on three occasions in December 2014, March 2015, and May 2015.

[8] At a review hearing on February 17, 2015, the court reaffirmed the permanency plan of placing Child with Sneed. However, that placement once again failed. On April 28, the trial court issued a permanency plan order in which it found that Mother had "failed to enroll or satisfactorily participate in the services and programs required in the dispositional decree," and it changed Child's permanency plan to termination of parental rights and adoption. DCS Ex. 17. DCS filed its petition for involuntary termination of parental rights on September 9, 2015, and a trial on that petition was held on February 9 and March 1, 2016. At trial, FCM Kammer testified that, at the time of trial, DSC had placed Child in a pre-adoptive home with her half-brother. Kammer testified that Child had been in that home for about a month and a half and that Child was "interacting well with the family. She's going to dance class learning the recreational activities. She's reportedly happy and doing well." Tr. at 40.

[9] On May 31, the trial court entered the following relevant findings and conclusions in support of terminating Mother's parental rights:

> 3. The child, [T.H.], has been removed from her parent(s) for at least six (6) months under a Dispositional Decree of the Allen Superior Court, dated February 26, 2013.

4.  It is established by clear and convincing evidence that the allegations of the Petition are true in that there is a reasonable probability that the conditions that resulted in the child's removal and the reasons for the placement outside the parent's home will not be remedied, and/or that continuation of the parent/child relationship poses a threat to the well-being of the child.

At the time of the initiation of the proceedings in the underlying Child in Need of Services proceedings, [Mother] had taken the child to the hospital for treatment and the hospital staff was concerned about her mental status and her ability to appropriately care for the child.

The child was removed from the mother's home at the Preliminary Inquiry Hearing that was held in the Allen Superior Court on November 1, 2012, and was adjudicated to be a Child in Need of Services on February 26, 2013.  A Parent Participation Plan was entered by the Court as part of its Dispositional Order on February 26, 2013.  The requirements of the Parent Participation Plan were designed to assist the mother in remedying the reasons for the child's removal and reasons for placement outside of the home.  Specifically, [DCS] made a referral to Park Center for the mother to complete a Clinical Assessment.  She completed the Clinical Assessment and psychiatric medication evaluations, home based services[,] and individual therapy were recommended.  She failed to regularly participate in medication evaluations and sometimes her therapist had to remind her that she needed to go to the appointments so that she could receive her injections.  [Mother] failed to regularly participate in home based services as well.  The last therapy session that she participated in was in August of 2015.  During the therapy sessions, the mother and her therapist had set goals of working on coping skills to help the mother manage anxiety, depression and the voices that she was hearing. Unfortunately, the mother only participated in 2 sessions with the therapist.  While the mother was at Park Center just prior to

her second therapy session, she got into an argument with a Park Center client in the lobby. She informed the therapist that she was hearing voices that were causing her a great deal of distress and informed her therapist that if staff had not intervened, she may have gotten into a physical altercation with the other client. Following the incident, the therapist was able to convince the mother to go to Parkview Behavioral Health for treatment. During the trial, the therapist testified that if the mother had not voluntarily sought treatment at Parkview Behavioral, she would have initiated proceedings for an involuntary commitment because she was concerned about the mother's safety as well as the safety of the community. The police had to be called to the scene at the time of the mother's second therapy appointment because of the safety concerns.

The mother left Fort Wayne in October of 2014 and moved to Los Angeles. She did not return to Fort Wayne until July of 2015. During that timeframe, she had sporadic contact with [DCS]. While in Los Angeles, the mother's housing was not stable, she lived with her mother and sister for a short period of time, lived in a homeless shelter and lived in a group home for persons with mental illnesses. Additionally, while residing in Los Angeles, the mother was hospitalized in a mental health treatment facility for a period of time. [DCS] has requested the mental health records from her inpatient stay while residing in Los Angeles and the mother has refused to provide the information.

Throughout the course of the underlying CHINS proceedings there were significant concerns about the mother's mental health status. She had inpatient stays at mental health facilities in December of 2014, December of 2015, and January of 2016. She reports that she has been diagnosed with bi-polar disorder, personality disorder, schizo-affective disorder and post-traumatic stress disorder. Her therapist advised that she sometimes stops taking her medications because she feels that she does not need

them and when she does stop taking her medications, her behavior declines and the voices that she hears get louder and more commanding. There is no doubt that [Mother] loves [Child;] however, she has serious mental illnesses for which she is unwilling or unable to receive treatment. When she is not receiving the proper treatment through therapy and medication intervention, her behavior deteriorates and she begins to hear voices. On at least one occasion when she was not taking her medication, she began to hear voices and almost got into a physical altercation with another client at Park Center. The mother was hospitalized at Parkview Behavioral immediately following the incident because of concerns about her behavior, safety[,] and the safety of others.

The child has been removed from her mother's home since November of 2012. She is in need of permanency and stability now and should not be required to wait any longer for her parents to successfully remedy the reasons for her removal from the home and the reasons for continued placement outside of the home. At the time of the initiation of the underlying CHINS proceedings, there were concerns about the mother's mental health and her ability to provide care for the child. At the time of the hearing on the Petition for Termination, there continued to be concerns about her mental health, stability[,] and ability to provide for the child. Additionally, there are concerns for the safety of the child if she were to be returned to the mother in light of her refusal to regularly participate in treatment to address her mental health diagnoses and her aggression when she is not receiving treatment.

* * *

Neither the mother nor the alleged or unknown fathers [sic] have remedied the reasons for removal and placement of the child outside of the parents' home. The mother has been provided with services that were designed to assist her in remedying the

reasons for removal and to assist her in providing for the basic necessities of a suitable home for the raising of the child[;] however, due to her mental illness, she has not remedied the reasons for removal. There continue to be concerns about the safety of the child were she to be reunified with the mother due to her untreated mental illness.

Accordingly, the Magistrate find[s] that [DCS] has proven by clear and convincing evidence that there is a reasonable probability that conditions that resulted in the child's removal from the home will not be remedied and/or that continuation of the parent/child relationship poses a threat to the well-being of the child.

5. Termination of parental rights is in the best interests of the child, [T.T.H.], in that the mother, [N.H.], . . . [has] shown over the course of the related CHINS cause, and in the fact of a treatment plan or plans, and numerous specific services made available and/or provided, that said parents continue to be unable, refuse, or neglect to provide for the basic necessities of a suitable home for the raising of said child.

The underlying CHINS proceedings were initiated because of concerns about [Mother's] mental health status and her ability to provide care for her child. At the time of the hearing on the Petition for Termination, she had had several hospitalizations at mental health facilities, yet failed to provide the DCS with records from each hospitalization so that they could ensure that she received the treatment that she needed in order to provide for herself and her child and to ensure the safety of the child in her care. She testified that she was unsure as to why she was hospitalized on those occasions and with respect to one of the hospitalizations, she could not remember whether she sought the treatment herself or whether she was involuntarily committed. Park Center's advance practice nurse testified at trial and advised that the mother's admission to Parkview Behavioral in August-

September of 2015 was as a result of an involuntary commitment.

[Mother] admitted to her therapist [and] treatment providers and admitted in court that she sometimes hears voices and admitted to her therapist that she sometimes talks to the voices. Treatment providers have prescribed medication to assist her with her diagnosis[;] however, she has not regularly taken her medication as prescribed and has failed to participate in therapy to treat her diagnosis. She has become angry with service providers involved in her case when they have made suggestions that she does not agree with and has frequently requested that she be permitted to change treatment providers. These frequent changes have interfered with her ability to make progress with her treatment and therapy. As an example, after her second therapy appointment at Park Center, where she was subsequently taken to Parkview Behavioral for treatment, the mother became angry with her therapist for reporting the incident to [DCS] and at the time of the termination hearing had not participated in therapy since August of 2015. She requested that her services be switched to another agency yet services had not begun as of the first day of the termination trial.

The mother's visits with the child have been put on hold on at least two (2) occasions during the underlying CHINS proceedings. The last time that the mother's visits were put on hold was in early January of 2016[;] however, [visits] were reinstated shortly after they were placed on hold. The mother visited with the child three (3) times in the month of January in 2016. The SCAN visitation supervisor advised that when the mother's visits started in February of 2016, she noticed signs of mental illness. On one occasion in February of 2016, [Mother] informed the visitation supervisor that she thought that people were trying to hurt her and her daughter. The mother failed to appear and did not call to cancel the next scheduled visit in February[;] however, [she] later called the visitation supervisor

asking about when her next visit was and told the supervisor that she was frustrated [and] overwhelmed and that she did not want to do visits anymore. In March of 2016, the mother called the visitation supervisor and advised that she wanted her visits to resume.

[Mother] is the mother of four other children. None of the other children are currently in her care as she is unable to provide for them due to her mental illness. From the testimony at trial, it is clear that [Mother] is unable to care for [Child] due to her mental illness. Although she has participated in some of the services that she was ordered to participate in, she has failed to participate in and benefit from the services that were designed to assist her in addressing her mental health issues—a significant reason for her initial involvement with the DCS. When she is not taking her medication, her behavior becomes sometimes hostile with others and she has required mental health treatment at mental health facilities.

\* \* \*

Accordingly, the Magistrate finds that the DCS has proven by clear and convincing evidence that termination of parental rights is in the best interests of the child, [T.T.H.], in that the mother, [N.H.], . . . [has] shown over the course of the related CHINS cause, and in the fact of a treatment plan or plans, and numerous specific services made available and/or provided, that . . . [she] continue[s] to be unable, refuse, or neglect to provide for the basic necessities of a suitable home for the raising of said child.

6. The Allen County [DCS] has a satisfactory plan for the care and treatment of the child, which is placement of the child for adoption.

ACCORDINGLY, THE MAGISTRATE RECOMMENDS
THAT THE COURT ORDER, ADJUDGE AND DECREE:
that parent/child relationship between [T.T.H.], the mother,
[N.H.], . . . child, . . . be terminated . . . .

Appellant's App. at 72-76. The trial court adopted the above findings and
recommendations as an order of the court, and this appeal ensued.

## Discussion and Decision

### *Standard of Review*

[10]  Mother maintains that the trial court's order terminating her parental rights was
clearly erroneous. We begin our review of this issue by acknowledging that
"[t]he traditional right of parents to establish a home and raise their children is
protected by the Fourteenth Amendment of the United States Constitution."
*Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind.
Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the
interests of the parents to those of the child when evaluating the circumstances
surrounding a termination. *Schultz v. Porter Cty. Ofc. of Family & Children (In re
K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child
relationship is proper where a child's emotional and physical development is
threatened. *Id.* Although the right to raise one's own child should not be
terminated solely because there is a better home available for the child, parental
rights may be terminated when a parent is unable or unwilling to meet his or
her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services.
>
> * * *
>
> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2) (2016).  DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights.  *Id.*  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans.*

*denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[13] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[14] Mother does not specifically challenge the trial court's findings of fact.[2] Rather, she contends that the trial court erred in its conclusions of law. Specifically, she alleges that the trial court erred in concluding: that DCS established that it had

---

[2] Although Mother disputes that she experienced auditory hallucinations at the time of Child's removal, the trial court did not find that as a fact or rely upon it in its decision. Appellant's App. at 72-76. Moreover, Mother admitted that she has experienced auditory hallucinations, and that evidence, along with other witness testimony and reports, supports the trial court's conclusion that Mother suffered from mental illness.

a satisfactory plan for Child's care and treatment; that she will not remedy the conditions that resulted in Child's removal; that the continuation of the parent-child relationship poses a threat to the well-being of Child; and that termination is in the best interest of Child. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we only address whether the trial court erred in concluding that Mother will not remedy the conditions that resulted in Child's removal and that termination is in Child's best interest. But first we address Mother's contention that DCS failed to establish that it had a satisfactory plan for Child's care and treatment.

### *Plan for Child's Care and Treatment*

[15] Mother contends that DCS failed to establish that it had a satisfactory plan for Child's care and treatment because, at the time of the termination proceedings, Child had only been residing in the pre-adoptive home for one and one-half months and DCS had not yet made a visit to that home. Appellant's Br. at 12, 19. However, Mother concedes that the DCS plan for adoption could be a satisfactory plan after termination of her parental rights. *Id*. at 17. We agree. *See, e.g.*, *Castro v. State Office of Family and Children*, 842 N.E.2d 367, 373 n.2 (Ind. Ct. App. 2006) (noting "adoption is generally a satisfactory plan"), *trans. denied*. Moreover, the evidence showed that Child was in a pre-adoptive home with a family member (her half-brother), and that Child was happy and doing well in the pre-adoptive home.

### *Conditions that Resulted in Child's Removal*

[16]  Mother maintains that the trial court erred in finding a reasonable probability that the conditions that resulted in Child's removal will not be remedied. In support, she points to evidence that she did comply with some of the court's requirements. However, Mother's argument on appeal is simply a request that we reweigh the evidence, which we will not do. *In re D.D.*, 804 N.E.2d at 265. Instead, we must determine whether the evidence most favorable to the judgment supports the trial court's conclusion. *Id.*; *Quillen*, 671 N.E.2d at 102.

[17]  In determining whether the evidence supports the trial court's finding that Mother was unlikely to remedy the reasons for removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cnty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not

required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[18] Mother does not dispute that Child was initially removed from her care due to the hospital's concerns that her mental illness made her unable to appropriately care for Child. Mother admitted that she previously had been diagnosed with bipolar disorder, personality disorder, schizo-affective disorder and post-traumatic stress disorder. And the evidence showed that, at the time of the termination hearing, Mother had failed to remedy, and was unlikely to remedy in the future, her mental illness and resulting inability to care for Child. Although Mother had obtained some mental health treatment during the CHINS proceedings, she had failed to regularly participate in individual therapy, home-based services, and medication evaluations as required by the court. The undisputed evidence further demonstrated that Mother had had auditory hallucinations and that medication reduced the voices in her head from loud, angry voices to whispers. Tr. at 133. Yet, Mother failed to take her medications regularly.

[19] Moreover, Mother left Fort Wayne in October 2014 and remained in California until July 2015, but she had only sporadic contact with DCS and no visitation with Child in that time period. During the course of the CHINS proceedings, Mother had several inpatient hospital stays due to her mental illness, including while she was in California, but she refused to provide DCS with the mental health records from each hospitalization so that DCS could ensure she received the treatment she needed in order to provide for herself and Child. Given that

evidence, we cannot say that the trial court erred in concluding that the conditions at the time of Child's removal were not, and likely will not be, remedied.

### Best Interests

[20] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs.* (*In re A.K.*), 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Ofc. of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224. Such evidence, "in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *L.S. v. Ind. Dep't of Child Servs.* (*In re A.D.S.*), 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

[21] Again, Mother's contentions on this issue amount to requests that we reweigh the evidence, which we will not do. Both FCM Kammer and Julia McIntosh, Child's Court Appointed Special Advocate ("CASA"), testified that termination of Mother's parental rights is in Child's best interest. Given that testimony, in

addition to evidence that Child needs permanency and stability that Mother cannot provide and that the reasons for Child's removal from Mother will not be remedied, we hold that the totality of the evidence supports the trial court's conclusion that termination is in Child's best interest. The trial court did not err when it terminated Mother's parental rights to Child.

[22] Affirmed.

Bailey, J., and May, J., concur.